*185] *James and John W. Baker for the use of Isaac Hazlehurst and Son *against* Andrew C. Smith.

Isaac Hazlehurst and Son assignees of James and John W. Baker *against* Andrew C. Smith.

Erroneous *teste* of *fi. fa.* by clerk, though executed, is amendable.
On a judgment had in term, a *fi. fa.* cannot issue returnable to the last return day of the term, though goods are only to be levied thereon.
*Aliter* of formal fictitious writs, which may be filed of course.

RULES to shew cause, why the executions issued should not be set aside, and restitution awarded ; and that the plaintiffs should be restrained from issuing further executions, without leave of the court.

The bond on which judgment was entered up in the first action, on the 1st August 1804, was conditioned for the payment of $7836 and 77 cents on the 29th December 1804. A *fieri facias* was taken out on the 5th October preceding ; returnable on the 4th December 1804, being the first return day of the term, upon which the defendant's store goods were levied. On an application to the chief justice in the vacation, he ordered the execution to be stayed, until the December term. This bond after the judgment, on the 22d September 1804, was assigned to Isaac Hazlehurst and Son.

The bond in the second action was given for the like sum, on the 22d September 1804, though it bore date on the 2d July preceding, and was payable on the 27th September following. Judgment was entered up thereon on the 7th December 1804,

[Baker *v.* Smith.]

after the term had begun, and on the next day a *fi. fa.* issued, tested on the 15th September 1804, the last day of the term, returnable on the last return day of December term, being 29th December 1804.

It appeared on the examination of witnesses, that the goods which were the consideration of the first bond, were originally contracted for on the 14th June 1804, by Robert Barret and the aforesaid Andrew C. Smith, payable by their notes in 6, 7, 8, 9, 10, 11, and 12 months, and secured by a mortgage on a country seat of Barret. It was afterwards discovered, that there was an incumbrance on the lands intended to be mortgaged, and the first agreement was cancelled. On the 29th June the goods were sold to Smith, payable in notes from 6 to 12 months, for $9736 and 77 cents. The repairs of a store $100, were added thereto, and a credit of $2000 being given for cash and notes drawn by Burton Wallace, payable from 6 to 12 months, the debt was reduced to $7836 and 77 cents, for which the first bond was given.

On the 22d September, Samuel Hazlehurst told Smith he was afraid that Barret would injure this concern, having given several *notes for the payment of his private debts. He pro- [*186 posed the giving of a new bond and warrant, and making it payable immediately; Smith was induced to give the second bond, under Hazlehurst's promises to befriend him and assist him with goods and money. This bond was to be made use of in case of danger, if things went wrong ; but this as one of the witnesses swore referred particularly to Barret. It was agreed at the time that Smith should give his notes for $500, payable every thirty days, the first payment thereof to be made in 90 days, in discharge of the bond. This agreement was to be reduced to writing by the attorney of Hazlehurst, but it was not done. On the 2d October, Smith got a small bale of goods of Hazlehurst and Son, to the amount of 200 dollars, and afterwards purchased of a Mr. Lancaster 1800 dollars worth of goods, in addition to his stock.

According to the testimony of the defendant's clerk, merchandize to the amount of $10,433 and 63 cents at prime cost, remained in the store when the sheriff levied. Until that period the defendant went on with his sales, making a profit of near 25 per cent. The goods on hand would have averaged a profit from 10 to 30 per cent., except the article of fans, of which there was a considerable quantity. But one of the city auctioneers estimated the value of all the goods on hand at their auction prices, to be no more than $5000.

The sheriff swore, that the first execution was levied, immediately after it came to his hands, and the defendant's store was then locked up. The goods were afterwards removed to save the high rent of the store, and arrangements were made to sell them in the most advantageous manner. Orders were given to him to sell for two instalments due 1st January and February

[Baker v. Smith.]

1805, and goods assorted· to the market were sold exceeding 1100 dollars at auction, at their full value. Another sale was directed for the instalment of 500 dollars, due 1st March, but the sale was stayed by the order of the court.

The court desired the counsel, who were to shew cause, to confine their argument to the legality of the execution issued in the second action. It seemed impossible to justify the first execution, either on the ground of the day of payment specified therein, or of the instalments agreed upon on the 22d September. That execution was taken out on the 5th October 1804.

The counsel for the plaintiffs then relinquished their first execution. They were willing to give any reasonable delay; all they asked was to be secured in their just demand, of which they would be wholly stripped if the defendant's rule was made absolute.

*187] *The case divided itself into two questions. 1st. Was the second execution irregular, and on that ground, to be set aside? 2d. If it was irregular, would the court award restitution and impose terms on the plaintiffs?

I. As to the *teste* of the execution issued on the 8th December, it was the act of the officer of the court. The præcipe of the attorney only pointed out the day of the return. The *teste* is a mere fiction. In a variety of instances, it necessarily must precede the judgment. There is *veritas legis et veritas facti*. The *teste* of the writ must be of the term, although the writ was prosecuted afterwards. T. Jones 150. The true time of issuing a writ is always inquirable into. If the *teste* is vicious, point out another day, and it shall be set right. This is a correct rule. It is laid down in the English cases, that as between the parties, an execution binds from the *teste;* but it is highly questionable, whether this position be correct here. A *fieri facias* binds from its delivery to the sheriff. 1 St. Laws 641. But if there has been any irregularity in the *teste,* it may be amended as the mistake of the clerk. A bill of Middlesex filed of record, may be amended agreeable to the truth. There is a distinction between amending those mistakes, which are occasioned by the act of the party, and of the clerk. 1 Term Rep. 782, 783. A clerical mistake may be amended in the return to a *mandamus,* after the return has been filed. Doug. 130, (135.) A verdict may be amended by the judge's notes. Ib. 362, (377.)

Lord MANSFIELD then says, it was impossible to believe there was such an absurdity in ·the law, as that the mere mistake of the officer should be without a remedy. A *ca. sa.* may be amended even after it has been executed. 2 Bla. Rep. 836. 2 Term Rep. 737.

Why might not this *fi. fa.* be made returnable on the second return day of the term? There is a marked difference between judicial and mesne process as to the days of their return. An execution need not be made returnable the term after it issues;

[Baker *v*. Smith.]

but there may be an intervening term between the *teste* and return. But it is otherwise as to mesne process in personal actions. 1 Crompt. Pract. 365. 2 Salk. 700. 2 Ld. Raym. 775. The practice however is uniform with us to issue original process returnable on the last day of the term. No ground of distinction can be pointed out unfavourable to our argument. The legislature make no difference, but declare, in order to obviate delays and inconvenience, " that the last day of every term shall be a " common day of return for all process, original, mesne or ju- " dicial ; and that the writs and process returnable on the last " day of the term, shall be as valid and effectual in all cases, and " to all intents and purposes, as if the same had been made re- " turnable *on the first day of the term." Act of 18th [*188 April 1795, sec. 2, 3 St. Laws 770. More general or comprehensive language could not be made use of to legalize such a proceeding as the present. It is true, in Ewing *v*. M'Nair, 2 Dall. 269, the court declined giving any opinion as to the effect of taking out a *ca. sa.* returnable to the second return day in order to charge special bail, or of a *fi. fa.* with like return, whereon lands might be levied within the county, and afterwards sold on a *venditioni exponas*, returnable on the first day of the following term. They had determined before that a term must intervene before a *testatum* could issue ; 1 Dall. 334, and here they resolve, that on a judgment of September term 1796, a *fi. fa.* might be minuted on the roll, as made returnable on the last day of that term, whereon to ground a *testatum fi. fa.* to another county, returnable on the first day of the next December term, in order to levy upon lands. In this instance, twenty-one days intervened between the time of issuing the execution and the day of its return. Matter of substance is at least equal to fiction. It could be of no moment to the defendant, in the case of goods levied, whether the *fieri facias* was made returnable to the last day of December term 1804, or to the first day of the present March term 1805. In either case the sheriff might sell the goods immediately after advertising them : and this consideration forms an important difference between goods and lands levied.

II. The inevitable consequence of the court's awarding restitution, if the execution *stricti juris* should be deemed irregular, must be the loss of the debt. The court have a discretion in this particular, and will not summarily interpose their authority unless injustice has been clearly done. The point is new and not free from doubt. The suitor's remedy has not been accelerated by his issuing the execution in the present mode. If the defendant has been injured, he has his remedy by action, and will recover damages proportioned to the wrong he has sustained. On the 22d September, he acquiesced in the plaintiff's right to an immediate execution. It will be said that a parol contract intervened, and controuled this right. Parol evidence will not be permitted to vary a written agreement. 3 Wils. 275. Why

4 YEATES—12

[Baker *v.* Smith.]

was the new bond made payable in five days, if the creditors were to wait for the first instalment of 500 dollars until the 1st January? Why was the bale of goods added to the original debt, unless the payment of the debt was intended to be accelerated? In no stage of the business does there appear any violation of good faith on the part of the plaintiffs, or of the obligees.

The counsel in support of the rule observed, that though the plaintiffs had acquiesced with the court's opinion that the first execution was wholly unsupportable, yet it was of importance to *consider the effects of it. All the store goods of the defendant had been levied on prematurely, locked up and removed, until the second *fi. fa.* issued on the 8th December. The chief justice had, by his order in the vacation, stayed proceedings until the court; and it was most highly improper for the plaintiffs to take out an execution on the second bond given for the same debt, while the matter remained *sub judice*.

The second *fi. fa.* was irregular, both as to its *teste* and return. A judgment entered in any part of the term or subsequent vacation, relates back to the first day of the term. 7 Term Rep. 21. 1 Ld. Raym. 695. The second judgment was confessed after the term had commenced, and the declaration could only have been entitled of December term 1804. The process on it should therefore have been tested on the first day of that term; or, as it issued in term time, on the day whereon it was made out, according to the usual practice. The testing it on the 15th September preceding was a perfect novelty. But the error is now rolled on the officer; and it has been contended, that considering it as his act, it is amendable. But this cannot be done without fully paying the costs thereof.

The intention of the act of 18th April 1795, is expressed to be, to prevent the delays and inconvenience which arose from the want of a second return day in the Supreme Court in each term, as well in the commencement as in the prosecution of suits. Before the act passed, a court was lost in many instances, where technical rules of law were to be pursued. It was designed thereby, that the party should elect whether his process should be made returnable to the first or last days of the term, not that on a judgment obtained during a term, lands might be sold within a fortnight afterwards, or special bail made chargeable within that short period. But the law only holds in cases of election. Previous thereto, on a judgment with a cesset until next term, a *fi. fa.* might be filed returnable to such term, whereon to ground a *testatum*. The act was meant to accelerate the proceedings, where to preserve consistency in the law, time must be allowed to file a fictitious writ; as in the case of *testatum* executions, or writs of *distringas juratores* founded on supposed *venire facias's*. In December term 1796, the court adopted this difference between real and fictitious writs in Ewing *v.* M'Nair, and the uniform usage of this court has been conformable thereto, in cases of judicial process. When goods are

[Baker *v.* Smith.]

levied upon, an execution returnable at a short day, certainly urges the sheriff to sell immediately.

It is not denied, that original process often issues to the second return day of the term; but it is obviously founded in error, where the party had no election. To say the most of it, the *only ground on which it can rest, is the cotempora- [*190 neous exposition of the act practised under, above nine years, and which is now become the evidence of right.

On the 14th June the goods were sold to Berret and Smith, who were to give their notes therefor, payable from six to twelve months. That contract being rescinded, a new agreement of the same nature was made with Smith on the 27th June, and allowing for the three days of grace, the first note would not be payable, earlier than 1st January 1805.

The first bond must have been understood as subject to those terms. The second bond was controlled by the collateral agreement of payment by instalments. No danger was contemplated except as arising from the conduct of Berret. The defeasance to the bond was to have been drawn by the attorney of the plaintiffs; and it must be considered as if executed and notes given under it. This agreement must evidently have been designed to shelter the defendant from the rigour of the plaintiffs. The former, if possessed of one ray of reason, could never have intended to surrender himself wholly to the latter, and submit his credit, the liberty of his person and his property in the store, altogether to their pleasure. But the plaintiffs, by a most unwarrantable proceeding, have locked up his store on the 5th October, upon a bond not payable until the 29th December following, when no instalment is pretended to be due.

Fraud may arise from the subject of the bargain itself, such as no man in his senses, and not under delusion, would make on the one hand; and as no honest or fair man would accept on the other. The common law takes notice of such inequitable and unconscionable bargains. And fraud may also be presumed from the circumstances and condition of the parties contracting. 1 Fonbla. 114. If there be such inadequacy of consideration, as to shew that the person did not understand the bargain he made, or was so oppressed, that he was glad to make it, knowing its inadequacy, it will shew a command over him, which may amount to a fraud. Ib. 118. 2 Bro. Cha. Rep. 175. For the cases in which an injunction will lie, to stay proceedings at law, see 2 Harr. Cha. Pract. 222-3. It lies when a bond has been sued, contrary to agreement. 2 Com. Dig. Chancery, D. 8, pa. 48, (223, pl. 9.) A bond and covenant shall be taken as one agreement, and construed together. 2 Vern. 519. An injunction in general lies, to restrain any injury and mischief not easy to be repaired. 1 Woodes. 206.

The court will judge, whether the necessary consequence of pronouncing the second execution to be irregular, is not an award of restitution; 2 Bac. 739, Execution P, 2 Tidd. 748, Cro. Jac.

[Baker v. Smith.]

246, Barnes, 196, 207; or if they should be of opinion that this *is discretionary with them, whether the circumstances of the case as disclosed in evidence, do not fully warrant their interposition, and authorize the making of the whole rule absolute.

SHIPPEN, C. J. did not amend the argument, and therefore gave no opinion.

YEATES, J. It has been admitted, that the execution which issued on the 5th October in the first action, cannot be supported. On the face of the bond, the money was not due until the 29th December, nor was any part of it payable until January following, under the parol agreement of paying it by instalments. Besides, the bond on which the judgment was entered, was surrendered to the defendant, before the execution issued; and a new bond was executed payable on the 27th September. On both grounds therefore, the first *fieri facias* clearly cannot be maintained.

The greatest difficulty rests on the regularity of the second execution, at the suit of Hazelhurst and son, issued on the 8th December, upon the judgment entered up on the preceding day, returnable to 29th December 1804, being the last return day of the term.

I do not take into consideration the *teste* day of this *fi. fa.* Because if it was erroneous merely in this particular, it being the mistake of the officer without special directions, it may be amended, according to the authority of many cases. The strength of the objection is, that the judgment being confessed of December term, after the court had begun to sit, no real execution could issue, returnable at an earlier day than the next March term.

The plaintiff's counsel have contended, that the general words of the act of 18th April 1795, comprehend this case. It extended " to all writs original, mesne or judicial process or other pro- " ceeding, which might be made returnable at the election of " the party suing out the same," &c. They assert, that it is the uniform practice to issue mesne process, after the term has commenced, returnable on the last return day of the same term; and that no distinction can be drawn from the expressions in the act, between mesne and judicial process. On the other hand, it has been insisted, that the issuing of mesne process in such cases was a common error, which having prevailed for nearly ten years, was mellowed down into evidence of right, and could not be attended with any bad consequences; but that *stricti juris*, the practice ought to have been restrained to cases, where the party had an election, to make his process returnable to the first, or second return days.

Ewing *et al. v.* M'Nair, 2 Dall. 269, has been cited *on both sides, determined in December term 1796. According to my note of that case, the court declared, " that where

[Baker *v.* Smith.]

" the filing of writs was merely formal, as in the matter then
" before the court, of filing a *fi. fa.* whereon to ground a *testa-*
" *tum,* or of a *venire facias* whereon to found a *distringas,* in
" order to accelerate a trial, no injury whatsoever could arise
" from making the *fi. fa.* or *venire,* returnable on the second re-
" turn day of the term.    But the adoption of the same practice,
" as to suing out a *ca. sa.* whereon to charge special bail, or a
" *fi. fa.* to levy lands, whereon a *venditioni exponas* might imme-
" diately issue, required more consideration ; as these did not
" appear to be the delays and inconvenience intended by the
" legislature, to be remedied by the law of 18th April 1795."
Salk. 589.    2 Barnes, 169, 171, 174.    1 Barnard. B. R. 392.    2
Tidd 743.

The court thus early distinguished between formal fictitious
writs, which might be filed as matters of course, and real writs,
which required the effective services of the ministerial officers.
But it has been urged, that no serious evils could arise in the
present instance, the *fi. fa.* being levied on goods ; and that
though the *fi. fa.* had been made returnable on the first day of
the March term ensuing, the sheriff might sell on the delivery
of the writ, after duly advertising the personal property.    It
will not be denied, that the *fi. fa.* being made returnable at a
short day, necessarily quickens the sheriff's pace.    If the pres
ent execution can be maintained, even considering its *teste* to
be amended, the consequence must be, that on every judgment
obtained by confession, or on a verdict during the term, an exe-
cution against the body, or lands and goods of the defendant,
may immediately issue to the last return day of the term, which
the majority of this court conceive, was never contemplated by
the law of 1795.    We are fortified in our opinion, by the senti-
ments of the court, expressed in Ewing *et al. v.* M'Nair, and the
uniform practice of the bar.    Attentive as those gentlemen are
to their clients' interests, this is the single instance, wherein an
effective execution has been  issued to the second return day of
the term, on a judgment entered up the same term.    It is strong
evidence of their sense of the practice.

We have been called upon, to award restitution of the monies
and effects levied, and under the circumstances of this case to
impose terms on the plaintiffs.

This applies to the legal discretion of the court.

We are not insensible to the harshness of the measures pur-
sued by Mr. Samuel Hazelhurst, in levying on all the goods of
the defendant, by an illegal execution, and locking them up from
the 5th October, while interest was running on upon the second
bond : but we also know, from what passed during the argu-
ment, *that if the amount of sales is restored to the de-     [*193
fendant, a probable if not certain loss will be incurred by
the plaintiffs.    Besides, the terms of the act are not sufficiently
clear and precise, to exclude reasonable grounds of doubt, on its
true construction.

[M'Cawley v. Smith.]

Under these impressions, we do not think ourselves warranted to interpose the summary powers of the court, as prayed for by the defendant's counsel; but find ourselves constrained to leave the party injured to his remedy at law by an impartial jury. At the same time, we flatter ourselves that the distressed situation of the defendant, and a sense of justice and propriety on the part of the plaintiffs, will induce an early compromise and settlement of this unfortunate business.

SMITH, J. concurred.

BRACKENRIDGE, J. I am of opinion, that the first execution was irregular, but not so of the second. I think the second execution is both within the plain words and policy of the second section of the act of 18th April 1795. The shadow follows the substance, and why shall we not pursue the expressions of the legislature, which shew best their true meaning? I am decidedly of opinion, that the defendant should have his remedy by his personal action, and agree fully with the sentiments of the court already expressed, except so far as they respect the return day of the second execution.

Executions in both actions set aside, and the rules made absolute so far, but no further.

Messrs. Ingersoll and Rush, *pro quer.*

Messrs. M. Levy and Wilson, *pro def.*

Cited in 9 S. & R. 284 in support of the decision that an omission in a *levari facias* of the command to levy the debt, is a clerical mistake, and may be amended, after error brought, by the court above.

Cited in 10 S. & R. 107 ; Bright. 455.

Cited in 12 Pa. 254; 27 Pa. 288 to shew that restitution is not of mere right. It is *ex gratia*, resting in the exercise of a sound discretion, and the court will not order it where the justice of the case does not call for it, or where the process is set aside for a mere slip, and there is danger that the plaintiff may lose his demand.